On Rehearing.
(Nov. 21, 1903.)
NICHOLLS, C. J.
The record, as has been stated, shows that on the 16th of June, 1896, the property involved in this litigation, belonging to Miss Pamela Moore, was adjudicated at a tax sale made in enforcement of the state taxes for 1894 to Dr. Vincent Boagni, who at that time was a mortgage creditor of the owner, by reason of a special mortgage granted by her on the 4th of June, 1893, to secure the payment of a promissory note maturing one year after date of the mortgage.
Dr. Boagni’s tax deed was recorded on June 18, 1896. The deed does not state under what law the sale was made, but defendant’s counsel declares it to have been made under Act 85 of 1888.
The deed declared that the property adjudicated was redeemable at any time for the space of one year, beginning on the day when the deed was filed for record, upon payment of the purchase price, with 20 per cent, and costs added.
The adjudicatee went into possession ex-trajudicially of the property a few days after the sale—whether or not with Miss Moore’s consent does not appear. She was absent from the parish of St. Landry when he did so. Had a stranger to the property become the adjudicatee, Boagni’s mortgage would, at the end of the year for redemption, have been cut off. He had, therefore, a personal interest in becoming himself the purchaser; but he was under no legal obligation, prior to the adjudication, to have paid the taxes and prevented the tax sale; nor did he, by any act of his, so far as the record shows, contribute to the bringing about of the same. We see no legal reason why he should not have become the adjudicatee at the sale.
It is argued that the immediate effect of the adjudication was ipso facto to extinguish his mortgage, and make him at once the absolute owner of the property. We are not of that opinion.
“The adjudicatee acquired but an inchoate title, which did not divest the liens against the taxpayer’s land until after the time limited by the law for redemption had passed.” Singer’s Appeal (Pa.) 7 Atl. 800.
“The general rule is that until the expiration of the time for redemption, and the execution and delivery of the deed, the title to the land remains with the execution debtor.” Cooley on Taxation (3d Ed.) c. 15, p. 984; Thibodeaux v. Kelly, 29 La. Ann. 511.
In the case at bar, before the expiration of the time for redemption had been reached, and while, therefore, Miss Moore’s title had not' yet been divested, and while Boagni’s mortgage was still alive, the latter executed the instrument embodied in the judgment which we have heretofore rendered herein. In that instrument no allusion is made as to who was in, or who was entitled to be in, possession of the property.
The preamble to the instrument declares thát “whereas on June 13, 1896, I purchased at tax sale the former residence of Miss Pamela Moore, in Opelousas [describing it] and whereas Miss Pamela Moore owes me a mortgage of $1,165.53 bearing on said property I hereby declare that Miss Pamela Moore shall have the right of redeeming said property any time within five years from this date upon payment of said sum with interest payable annually and also yearly taxes and yearly insurance, the extension to be granted yearly upon payment of said interest, taxes and insurance.” The declaration made by Boagni that Miss Moore owed him at that time a “mortgage” of $1,165.53, bearing on said property, was strictly correct.
Boagni had become the adjudicatee of the property for $33, and Miss Moore was entitled at that time to have redeemed it for that sum, 20 per cent., and costs.- Boagni could , not have forced her, as a condition precedent to redemption, to pay him the amount of his mortgage debt, though it was then due. So far as his rights under the mortgage were concerned, he would have been compelled to enforce them through the usual legal proceedings. Had she redeemed at that time, her ownership would have remained unaffected by the tax sale, as would Boagni’s rights under his mortgage. It is from that condition of affairs as a starting *499 point that we are called on to construe the document executed by Boagni at that time, which defendants, in their brief on rehearing, recognize to have been accepted by .Miss Moore.
The district judge was of the opinion that the effect of that agreement was to create an antichresis, or at least to bring the parties into rights and obligations analogous to those springing from that contract.
In his reasons for judgment he said: “The plaintiffs contend that, the act of February 27, 1897, converted the former relations between the parties into an antichresis, and that defendants are bound to account to them for fruits and revenues since the date of this act. They pray to be restored to possession as owners of the property upon payment to defendants of the original debt of $1,165, with interest, cost of insurance, and taxes paid, less the rents and revenues derived by defendants from the property.
“The defendants contend that the act of February, 1897, is not an antichresis, but a mere declaration of the creditor, voluntarily giving the debtor a right to redeem the property, and, having failed to do so within the delay, she has forfeited such right, and is not entitled to recover.
“They claim the right to hold the property as owners under the tax title, and pray that the demands be rejected, and, in the alternative, if they be decreed to account as owners under an act of antichresis, they be allowed interest on disbursements, and something for the care of the property. With their answer they file an account of rents and revenues, and of disbursements on account of the property. The case depends for its solution wholly upon the question whether the act of February, 1897, is to be taken as an antichresis, or a mere right of redemption.
“Both Dr. Boagni and Miss Moore being dead, and not having testified in' the case, the court is without any evidence of their intentions, except such as can be derived from the act itself, and the intrinsic probabilities to be inferred from the known facts surrounding its execution.
“An antichresis is a contract of real property for the security of a debt, whereby the creditor is put in possession of the property, to be administered by him for the payment of the debt out of its revenues, and must be in writing. When entered into between a debtor and creditor, the creditor cannot become owner of the pledged immovable by failure of the debtor to pay at the stated time. Any stipulation or clause to the contrary is null. In such cases he can only enforce his pledge by an order of court ordering a seizure and sale of the pledged immovable for the payment of the debt. Civ. Code, arts. 3133, 3135, 3167, 3179.
“The relation between the parties as creditor and debtor began in 1893, as mortgagor and mortgagee, at which time the mortgagee acquired merely the right to have the mortgaged property seized and sold in satisfaction of this debt at its maturity, in June, 1891, and thereafter up to June, .1896, when the mortgagor became its purchaser at the tax sale. Up to this time no change had taken place in the relations between the parties and the property stood simply pledged as a security for the debt. After the tax sale, and during the absence of the mortgagor, the mortgagee took possession of the property, several months before the delay had expired within which the mortgagor had a right to redeem. This he had no right to do without an order of court or the consent of the tax debtor. There is no evidence of such consent, except such as may be in-' ferred from the conduct and acts of the mortgagor. It must be inferred that she assented not only to the terms and conditions of that act, but to the continuous possession of the mortgaged property by the mortgagee.
“Nothing is said about the possession in the act, but it cannot be questioned that Miss Moore knew of it, as it was her home, where her household furniture was, and to which she had returned. The mortgagor having no right to take possession of the property, except as stated under the tax sale, until twelve months thereafter, he cannot be heard to say that he holds possession thereunder.
“Having taken actual possession prior to that time, he could only acquire possession by consent of the owner; and, as that consent must be inferred from her acts as above stated, that right originated at the date of such consent, on the 27th of February, 1897. The mortgagee’s legal possession began then only, and only by the implied consent of the *501 owner, and is not derived from the tax sale. He may have, as a fact, taken possession under the tax sale; but, having' no legal right to do so, he acquired thereby bo right to possession.
“The defendants claim under the tax sale, and they could legally do so, perhaps, if the act of February, 1897, effected no change in the relation between the parties. Presuming that the assessment and sale of the property for taxes was regular and legal, Boagni’s title would have become perfect one year thereafter, which he must be presumed to have known; and, if it had been his intention to secure title, why did he extend the period of redemption five years? If it had been his intention to profit by Miss Moore’s failure to pay up at the end of the five years, why is there no mention of this —not even by implication? He was a man well versed in all business transactions of this kind, while Miss Moore was an inexperienced young woman; and it is not probable that an important stipulation of this character would have been left out if it had been his intention to avail himself of such a provision. The inference is, to my mind, irresistible that in purchasing at tax sale the sole intention of the purchaser was not to merge, but to preserve, his mortgage, and the act of February, 1897, was intended to make more effectual the security for the debt. It was, of course, known by Dr. Boagni that Miss Moore had the right to redeem her property at that time, which, if she had done, would have left Mm with nothing but his mortgage rights acquired in 1893. Hence, in order to attain an additional security for his debt, it became necessary to maintain his unlawful possession of the property as a pledge, and in order to do so it was important to secure the consent of Miss Moore to his possession, and, to accomplish this purpose, and in a measure to compensate her, gave a delay of five years for redemption. This is a reasonable interpretation of the act, as to the motives actuating Dr. Boagni'in the execution and delivery of that act to Miss Moore. The recital of the tax sale and the mortgage in the act is manifestly made merely as a reminder of his claims against the property. It cannot be considered as a declaration of title under which he intended to hold the property, for this would not be consistent with the other stipulations in the act.
“The motives of Miss Moore lie on the surface. She had failed to pay the debt—the taxes, interest, or insurance—and was' helpless in the hands of the creditor. Her property had been sold for taxes, and, when she returned, she found her creditor in possession. What occurred between them in February, 1897, leading up to the act we cannot know, beyond its contents; hut, presuming she had some knowledge of her rights, it is reasonable to infer that she was aware of her right to redeem and retain possession of her property, and that she willingly assented to his continued possession on condition of the extension of time for redemption.
“Nothing is said in the act about rents or revenues, nor about reimbursement for disbursements for repairs, etc., and- we are left to inference in this respect. It would not be consonant with reason to suppose or infer that Dr. Boagni, in event of a redemption within the delay, would not have required payment for any useful repairs or improvements he had made during his possession and control of the property.
“Nor would it be consonant with reason to infer that Miss Moore, in such an event, would not have required an accounting for rents and revenues.
“Equally unreasonable would it he to infer that Miss Moore intended to give Dr. Boagni the use of her property, with its rents and revenues, for nothing, during a period of five years.
“Bearing in mind the fact that originally the amount of the debt did not greatly exceed one-third of the value of the property; that there is nothing in the evidence, written or oral, indicating the intention, of the creditor to acquire the ownership of the property; that his acts point unmistakably towards strengthening the security for his debt; that the dictates of humanity and justice forbid the taking of the property of another without a fair equivalent; and presuming that the creditor was actuated by such motives—it is just and reasonable to conclude that the act of February 27, 1897, is, and was so intended by the parties to be, an additional security obligation, pignorative in character, and in effect an antichresis. *503 As correctly stated by counsel for plaintiffs, ‘The equities are altogether on the side of the plaintiffs.’ Should judgment be given for plaintiffs, the defendants lose nothing, for they will have collected the entire amount of the original debt, interest, insurance, principal, and cost, which was the object and purpose of the' creditor from the beginning to the end of his dealings with his debtor. On the other hand, should judgment be given defendants, they will have had the rents and revenues for five or six years, amounting to $1,469.33, according to this account, and would acquire property worth $3,000, making a total of $4,469.33, for which, according to the same account, the consideration would be $2,018.72— considerably less than one-half of the value of what they would get. See Livingston, Ex’x, v. Story, 11 Pet. 351, 9 L. Ed. 746, and Payne v. Habbard, 42 La. Ann. 395, 7 South. 572.”
While we do not concur in all the statements of the district judge, the reasons assigned by him for reaching the conclusion he did as to the intentions and purpose of the act of February, 1897, are certainly very strong. It can scarcely be credited that Miss Moore, with a mortgage so small in amount, relatively to the value of her property, as this mortgage was, should have been willing to enter into any such arrangement as defendants claim the act of 1897 evidenced, when she could doubtless have borrowed the amount needed to pay off Dr. Boagni on terms so much more favorable; that she should -have been willing to permit interest to run for five years upon her debt, while allowing her creditor in the meantime to draw all the revenues from the property; that she should have consented to fixing so remote a term for freeing it from incumbrance and retaking possession, and ultimately doing so upon terms so very onerous.
We have no doubt that Miss Moore, finding on returning to her home that Dr. Boagni was, in point of fact, in possession of the property, with a mortgage upon it, was willing and consented to his remaining in possession, and to work out the debt through the revenues. Though badly expressed, we think that the understanding and agreement was that Boagni’s title for the time being shall remain “inchoate,” as it then was, and his mortgage still alive; that he should hold possession of the property under the agreement, and administer it for joint benefit;, that should the revenues of the property every year pay the interest, taxes, and insurance, matters should pass on to the next year, but, if they should not do so, them Boagni’s inchoate title was to ripen into a perfect one, without the necessity of foreclosing his mortgage, but, should the revenues each year discharge the interest, taxes, and insurance, any surplus would be applied to the extinguishment of the mortgage debt. When the entire debt was paid, his inchoate right under the adjudication would end, as also his mortgage rights. Miss Moore would retake her property as if she had redeemed it originally.
That is, we think, the real explanation of the whole situation. It places all parties in reasonable positions, and absolves the creditor from having driven with his debtor the very hard agreement which defendants contend for.
We do not think it at all necessary that any particular name or designation should be assigned to the arrangement which the parties entered into—that we should declare whether it was an antichresis or not. The rights and obligations of the parties do not depend upon the name to be given to the agreement which they made, but upon the facts of the case, and the legal consequences flowing from them. There was nothing illegal or improper in such an arrangement, unless it was that, on the failure of the revenues any one year to make the anticipated partial payment, the property, ipso facto, should become the property of Boagni. It is not of the essence of a mortgage that the mortgagor should remain in possession, and a consent between the parties that the mortgagee should take possession and work out the mortgage debt has been recognized as leaving the contract of mortgage intact. See Hutchings v. Fields, 10 La. 244; Webre, Syndic, v. Beltran, 47 La. Ann. 201, 16 South. 860.
Defendants declare in their answer that the act of Dr. Boagni was one of pure indulgence to Miss Moore, but we fail to discover any indulgence in his act, under the interpretation which defendants place upon it.
Plaintiffs have prayed for an amendment *505 •of the judgment appealed. They aver that there was error to their prejudice in the judgment rendered in the court below, in this: It found that thé tenure of the defend,ant to the property was that of a creditor in the contract of antichresis, and yet did not .allow an annual imputation of the excess of the rents and revenues of the property, over -the taxes, insurance, and other expenditures thereon, first to the interest, and then to the principal, of the debt, although said annual •excess was much more than the interest, and that, had said excess been imputed annually, .as the law required, first to the interest, and then to the principal of the debt, the balance ■due would have been found much less than that found in the judgment. She therefore prayed that the judgment appealed from be amended so as to impute the excess of the rents and revenues of the property in controversy, over the legal expenditures made thereon, first to the interest, and then to the principal, of the debt, annually, instead of the •end of the period covered by the account filed by the defendant and appellant.
Plaintiff complains of the method followed in computing interest.
After re-examining defendant’s account, we have arrived at the conclusion that interest should he calculated on defendant’s note secured by mortgage from its maturity to a date when the collections of rents by the late Dr. Boagni was of a total over and above the interest on his note.
After thus deducting them at the end of •each year, if the interest .is less than the amount of the rent collected, then deduct rent account for the year from the rent amount of that year. If the amount of rent is not sufficient to pay the amount of interest, no credit will then be given until the end of that year, and so on to the end. Balance arrived at to bear usual interest—legal •or conventional, as the case may be; if balance be due on note, then 8 per cent.; if •on account, 5 per cent.
In this manner defendant is to receive •credit for all amounts due on her note at 8 per cent.
And for all amounts due for improvements and taxes.
Plaintiff is credited with amount of her rents from different periods, at the end of each year the amount of rent exceeds the amount of interest.
It is- therefore ordered, adjudged, and decreed that the judgment of the district court, as relates to interest, be amended by .following the method of calculation heretofore indicated; that is, by deducting rents from principal and interest on note, and from defendant’s expense account, at dates near as possible corresponding to amount of rent at the end of the year, and so on, to the end of the calculation.
It follows that the judgment of the district court for balance of $475.39 is recalled and set aside, and that now plaintiff shall be placed in possession, after settlement and payment as herein set forth.
With these amendments of our decree and the decree of the district court, our decree heretofore handed down remains unchanged, and is affirmed and reinstated.
Costs of appeal to be paid by appellees. •